# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| VALLEY FOOD SERVICES, LLC, | ) | Case No. 06-50038 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| MAUREEN SCULLY, Chapter 7 Trustee for the Valley Food Services, LLC Bankruptcy Estate, | ) ) ) | |
| | ) | |
| v. | ) | Adversary No. 08-4013 |
| | ) | |
| HAROLD M. DANZIG, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

The Court takes up for consideration and ruling the Chapter 7 Trustee's Motion for Summary Judgment on her Complaint against Harold M. Danzig to recover the value of the allegedly preferential transfer (the "Transfer") that occurred when the Debtor's primary lender, Mission Bank, perfected a lien in the Debtor's personal property within a year of the petition date. Danzig is potentially liable for the Transfer under 11 U.S.C. §§ 547 and 550 as an insider-guarantor of the Debtor's obligation to Mission Bank.

For the reasons set forth below, the Court will deny the Trustee's Motion for because there is a material issue of fact regarding the value of the benefit conferred on Danzig as a result of the Transfer. The Trustee is, however, entitled to partial summary judgment on all of the other elements of her Complaint.

## STANDARD OF REVIEW

Fed. R. Civ. P. 56(c), applicable to bankruptcy proceedings pursuant to Fed. R. Bank. P. 7056, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency.[1] "If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue."[2] The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts and cannot simply rest on denials in the pleadings.[3]

## BACKGROUND

As a preliminary matter, the Court addresses Danzig's suggestion that this matter is not ripe for summary judgment because he supposedly has not had the opportunity to conduct the discovery necessary to respond to the Trustee's motion. Danzig's suggestion is not well taken. At the September 30, 2008 pretrial conference on this matter, Danzig (through counsel) affirmatively represented to the Court that he believed the matter <u>was</u> ripe for resolution by summary judgment without further discovery. The Court will therefore disregard Danzig's suggestion to the contrary as well as the facts Danzig asserts – without reference to pleadings or affidavit – which he "anticipates" he will be able to establish with additional discovery.

The following facts are undisputed:

1. On February 14, 2006, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. On June 27, 2006, the Debtor's bankruptcy case was converted from a Chapter 11 case to a Chapter 7 case. The Plaintiff, Maureen Scully, was appointed as the Chapter 7 trustee ("Trustee") for the Debtor's bankruptcy estate on or about June 28, 2006.

3. On September 18, 2000, the Debtor signed and delivered to The Mission Bank ("Mission Bank") a promissory note in the original principal amount of $3,000,000.

---

[1] *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir. 1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978).

[2] Fed. R. Civ. P. 56(d)(1), applicable to bankruptcy proceedings pursuant to Fed. R. Bank. P. 7056.

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

4. In connection with the September 2000 Note, the Debtor executed a Security Agreement under which the Debtor granted Mission Bank a first priority lien on substantially all of the Debtor's personal property.

5. Also in connection with the execution of the September 2000 Note, on September 18, 2000, Danzig signed and delivered to Mission Bank a Guaranty pursuant to which Danzig guaranteed the payment and performance of any and all obligations owed by the Debtor to Mission Bank.

6. On December 22, 2000, the Debtor signed and delivered to Mission Bank a promissory note in the original principal amount of $487,500.

7. In connection with the December 2000 Note, the Debtor executed a Security Agreement pursuant to which the Debtor granted Mission Bank a first priority lien on certain property.

8. On September 29, 2004, the Debtor signed and delivered to Mission Bank a promissory note in the original principal amount of $1,500,000.

9. In connection with the September 2004 Note, the Debtor executed a Commercial Security Agreement under which the Debtor granted Mission Bank a first priority lien on certain property.

10. Also in connection with the September 2004 Note, on October 19, 2004, Danzig executed a Guaranty under which Danzig unconditionally guaranteed the payment and performance of all obligations owed by the Debtor to Mission Bank.[4]

11. The Guaranty Agreements both contain the following language:

> So long as any portion of the Obligations remains unpaid and/or any portion of the Obligations that has been paid to Lender remains subject to invalidation or reversal as a preference or fraudulent transfer or otherwise or to being set aside and/or required to be repaid to Borrower as a debtor in possession or to any trustee in bankruptcy, each undersigned Guarantor hereby unconditionally and irrevocably waives, releases, disclaims and relinquishes (a) any indebtedness or obligation owed to such Guarantor by Borrower, however created or evidenced and whether the same or the right to claim the same now exists or is created or arises hereafter, and all rights to receive any payments or benefits whatsoever from Borrower, (b) all liens and security interests securing or purporting to secure any indebtedness, obligation or right to payment owed by Borrower to Guarantor, and (c) all rights, remedies and

---

[4] The September 2000 Guaranty and the September 2004 Guaranty are collectively referred to herein as the "Guaranty Agreements."

claims, whether at law or in equity, relating to any of the foregoing. The foregoing waiver, release, disclaimer and reimbursement includes, but is not limited to, all rights of subrogation, indemnification, reimbursement, and contribution, all contractual rights to payment of money, all statutory rights and remedies of Guarantor against Borrower under the Bankruptcy Code of 1978, as amended, and/or laws pertaining to guarantys or suretyship, and all other rights, remedies and claims any Guarantor may have against Borrower.

12. On November 1, 2005, Mission Bank perfected its liens on substantially all personal property of the Debtor by filing a UCC-1 Financing Statement, File Number 20050110809H.[5]

13. As of that date, the Debtor owed Mission Bank a total of $7,893,150.23 under the September 2000 Note, the December 2000 Note and the September 2004 Notes (the "Indebtedness").

14. As a result of the perfection of Mission Bank's lien, the Indebtedness was transformed from a partially secured debt to a fully secured debt.

15. As of November 1, 2005, the value of the collateral subject to Mission Bank's liens exceeded the amount of the Indebtedness.

16. The Debtor was insolvent on November 1, 2005.[6]

17. In December 2005, Danzig provided $2 million of capital to the Debtor.

18. On February 11, 2008, Plaintiff made demand on Danzig for payment of $7,893,150.23. This amount remains unpaid.

19. The assets of the bankruptcy estate are and will be insufficient to pay 100% of the unsecured claims against the estate.

## DISCUSSION

---

[5] Danzig disputes that the Bank perfected its interest in certain of the Debtor's semi-trailers, but admits that the Bank did perfect all of the collateral covered by the financing statement.

[6] The Defendant disputes this fact, but he has not offered any evidence to the contrary – by affidavit or otherwise. An unsupported denial is insufficient to create a material issue of fact. Fed. R. Civ. P. 56(e). The Court therefore accepts the Trustee's assertion that the Debtor was insolvent on the date of the allegedly preferential transfer (November 1, 2005) based on a financial statement showing that the Debtor was insolvent by $10 million on November 2, 2005, the day after the transfer.

To avoid a transfer as a preference, the Trustee must establish every element of § 547(b),[7] which provides:

> (b) Except as provided in subsections (c) and (I) of this section, the trustee may avoid any transfer of an interest of the debtor in property-
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made-
>   (A) on or within 90 days before the date of the filing of the petition; or
>   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if-
>   (A) the case were a case under chapter 7 of this title;
>   (B) the transfer had not been made; and
>   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

To recover a transfer avoided under §547 from a creditor for whose benefit the transfer was made, a trustee must establish the additional fact that the recovery is being recovered "for the benefit of the estate."[8] The other elements required by § 550 to recover a preference overlap with elements already necessary under § 547.

Danzig disputes the Trustee's Motion on five grounds. He argues that the undisputed facts establish: (1) that Danzig was not a creditor at the time of the Transfer, as required by §§ 547(b)(1) and 550(c)(2); (2) that the Transfer was not made for his benefit, as required by §§ 547(b)(1) and 550(c)(2); (3) that recovery of the Transfer from him will not benefit the estate, as required by § 550(a), inasmuch as all of the proceeds will (allegedly) go to a secured creditor (Mission Bank); and (4) he has a valid "new value" defense under § 547(c)(1) for $6 million. Finally, Danzig argues that there is a material issue of fact as to the value of the benefit he received as a result of the Transfer. The Court addresses each of these issues in turn.

**1.    Danzig is a creditor for purposes of §§ 547 and 550.**

---

[7] 11 U.S.C. § 547(g).

[8] 11 U.S.C. § 550(a).

To prevail under §§ 547 and 550, the Trustee must establish that Danzig was a creditor at the time of the Transfer. The Bankruptcy Code defines a creditor as one who has a "claim" against the debtor that arose at the time of or before the order for relief.[9] A "claim" is defined as including any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[10] A guarantor of a debtor's obligation to a third party is considered a creditor under the Bankruptcy Code, even though the debtor's obligation to the guarantor does not ripen until the guarantor pays on the guaranteed debt. Put simply, "guarantors are classic examples of creditors holding 'contingent' claims."[11]

> A guarantor holds a contingent claim from the moment of the execution of the guaranty. Whether that right has ripened into a right of reimbursement as of the bankruptcy filing is not determinative. It is simply a question of timing.[12]

As Danzig points out, several courts have held that a guarantor who unconditionally waives his rights of subrogation, *i.e.*, his right to pursue the debtor for any sum paid on the guaranty, is not a creditor of the debtor under the Bankruptcy Code and is therefore immune to liability for a preferential transfer even though he may have benefitted from the transfer.[13] Danzig contends that the Guaranty Agreements contain such a waiver. The Court disagrees.

The Guaranty Agreements both provide in pertinent part:

*So long as any portion of the Obligations remains unpaid and/or any portion of the Obligations that has been paid to Lender remains subject to invalidation or reversal as a preference or fraudulent transfer or otherwise or to being set aside and/or required to be repaid to Borrower as a debtor in possession or to any trustee in*

---

[9] 11 U.S.C. § 101(10).

[10] 11 U.S.C. § 101(5).

[11] *See, e.g.*, *In re Wefelmeyer Construction Co.*, 1997 WL 37574, 2 (Bankr. E. D. Mo. 1997); *In re Friendship Child Development Center, Inc.*, 164 B.R. 625, 627-28 (Bankr. D. Minn. 1992).

[12] *In re Helen Gallagher Enterprises, Inc.*, 126 B.R. 997, 1000-01 (Bankr. C.D. Ill. 1991).

[13] *See, e.g.*, *Hostmann v. First Interstate Bank of Oregon, N.A.* (*In re XTI Xonix Technologies, Inc.*), 156 B.R. 821 (Bankr. D. Ore. 1993); *Hendon v. Associates Commercial Corp.* (*In re Fastrans*), 142 B.R. 241 (Bankr. E.D. Tenn. 1992); *Covey v. Northwest Community Bank* (*In re Helen Gallagher Enterprises, Inc.*), 126 B.R. 997 (Bankr. C.D. Ill. 1991).

*bankruptcy*, each undersigned Guarantor hereby unconditionally and irrevocably waives, releases, disclaims and relinquishes (a) any indebtedness or obligation owed to such Guarantor by Borrower . . . .[14]

The italicized language unambiguously indicates that Danzig's potential claim against the Debtor is "unconditionally" waived only so long as the Debtor's obligations remain unpaid. Once Mission Bank is paid in full, Danzig is free to pursue a claim for reimbursement against the Debtor. Thus, the "waiver" does not eliminate Danzig's claim, it only serves to delay the contingency to which it is subject. It is still a claim cognizable under § 101(5), and Danzig is still a creditor under § 101(10)(A) and for purposes of §§ 547 and 550.

Ironically, one of the cases upon which Danzig relies hinges on this very distinction between an absolute waiver of a guarantor's right of subrogation and a "waiver" that merely delays the guarantor's right of subrogation until the lender is paid in full. The court in *In re Northeastern Contracting Co.*[15] considered two such waivers and held that the guarantor who had executed the absolute waiver was not a creditor, but the guarantor who had executed the conditional waiver was.[16] The other cases cited by Danzig are similarly unavailing in that they all involved absolute waivers – which is not the case here.

Therefore, for these reasons, the Court finds that Danzig is a creditor for purposes of §§ 547 and 550.

**2.     The Transfer was made for Danzig's benefit for purposes of § 547 and 550.**

As noted above, to prevail under §§ 547(b) and 550(a), the Trustee must establish that the Transfer was made for Danzig's benefit. Danzig argues that the Trustee has failed to establish this element, but not because he denies benefitting from the Transfer; Danzig concedes this point. Rather, Danzig argues that §§ 547 and 550 require the Trustee to establish that the Debtor

---

[14] Emphasis added. And by way of clarification: Mission Bank is the "Lender," "Obligations" refers to the Debtor's obligations to Mission Bank, and Danzig is the "Guarantor."

[15] 187 B.R. 420 (Bankr. D. Conn. 1995)

[16] *Id.* at 423. The court further observed that guaranty language postponing a guarantor's right of subrogation pending payment in full of the lender merely tracks the language of Code § 509(c), under which a guarantor's claim for reimbursement or subrogation is subordinated to the lender's claim until the lender is paid in full. *Id.*

7

subjectively intended for the Transfer to benefit Danzig, and the undisputed facts show (and the Trustee concedes) that the Debtor did not subjectively intend for Danzig to benefit by the Transfer. The Trustee responds, and the Court agrees, that there is no intent element in §§ 547(b) or 550(a).

The Court first looks to the language of the statute. "When the statute's language is plain, the sole function of the courts is to enforce it according to its terms."[17]

Danzig argues that the language in §§ 547(b)(1) and 550(c)(2) requiring that the transfer sought to be avoided and recovered be made "for the benefit" of a creditor implies an intent requirement. Danzig's interpretation of this language is not without support,[18] but the Court is not persuaded by the cases cited.   When read in isolation, the phrase "for the benefit" might suggest an intent requirement, but when it is read in conjunction with other sections of § 547 and § 548 (the neighboring avoidance provision), it is clear that no intent requirement should be implied in § 547(b) or § 550(a).   For example, sections 547(c)(1)(a), 548(a)(1)(A), 548(a)(1)(B)(ii)(III), and 548(e)(1)(D) require bankruptcy courts to consider a party's "intent," with the words "intent," "actual intent," or "intended" appearing in the text of the statute. In contrast, §§ 547(b) and 550(a) do not contain the word "intent" or any variation thereof. The absence of an express "intent" requirement in §§ 547(b) and 550(a)(1) was, in the Court's view, a purposeful choice by the drafters of the Code. This interpretation is supported by the great weight of authority, and the Court believes it is the better reasoned authority.[19]

Therefore, the Court finds that the Transfer was made for the benefit of Danzig, as required for avoidance and recovery of the Transfer under §§ 547 and 550.

### 3.     Recovery of the Transfer will benefit the estate as required by § 550(a).

---

[17] *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

[18] *See In re Bullion Reserve of North America*, 922 F.2d 544, 548 (9th Cir. 1991) (finding an implied intent requirement); *In re Valley X-ray Co.*, 360 B.R., 254, 260-261 (E.D. Mich. 2007) (same).

[19] *See, e.g., In re Robinson Brothers Drilling, Inc.*, 892 F.2d 850 (10th Cir. 1989) (specifically rejecting any requirement of subjective intent under the insider preference provision of § 547(b); *In re CF&I Fabricators of Utah Inc.*, 163 B.R. 858, 878-79 (D. Utah 1994) (concluding that subjective intent not a necessary requirement to establish claim under §§ 547 and 550); *Baldi v. Lynch* (*In re McCook Metals, L.L.C.*), 319 B.R. 570 (Bankr. N.D. Ill. 2005) (party can be a transfer beneficiary under § 550(a)(1) without a showing that the transferor intended to benefit the transferee).

Section 550 states that transfers avoided under § 547 may be recovered by a trustee "for the benefit of the estate." Danzig contends that this phrase means "benefit to unsecured creditors," and asserts that the undisputed facts (allegedly) show that a recovery from him will benefit only Mission Bank, a secured creditor. Therefore, Danzig argues, the Trustee cannot proceed against him under § 550(a).

Although there would appear to be an issue of fact as to whether recovery of the Transfer will benefit general unsecured creditors or will benefit just Mission Bank – the Trustee contends that the general unsecured creditors will benefit from a recovery from Danzig – that issue is irrelevant because the Court holds that the estate will "benefit" within the terms of § 550 if the recovery benefits *any* creditor – administrative, secured, or unsecured.

The Eighth Circuit Court of Appeals addressed this very issue in *Stalnaker v. DLC, Ltd.*,[20] and concluded that the phrase "for the benefit of the estate" is not synonymous with "for the benefit of unsecured creditors."[21] Quoting from the decision on appeal, the Court of Appeals noted with approval:

> "Estate" is a statutory term that Congress uses to denote the asset side of the bankruptcy balance sheet. 11 U.S.C. § 541 defines what constitutes property of the estate and what can be credited to the asset account. In virtually every case, recovery of any property benefits the estate. In fact, section 541(a)(3) specifically includes in the estate property recovered under section 550. Creditors are on the opposite side of the balance sheet.[22]

Danzig urges the Court to limit this holding to *Stalnaker*'s facts. In *Stalnaker*, the Bankruptcy Appellate Panel and Court of Appeals found that the estate benefitted from the trustee's recovery of a fraudulent transfer, even though none of the proceeds went to the unsecured creditors (who had all settled with the trustee on the eve of trial) because the proceeds would pay administrative expenses of the estate, including attorneys' and trustee's fees and expenses. According to Danzig, this case differs because Mission Bank will get the entire recovery.

---

[20] 376 F.3d 819 (8th Cir. 2004).

[21] *Id*. at 823.

[22] *Id*. (quoting *Stalnaker v. DLC, Ltd., (In re DLC, Ltd.)*, 295 B.R. 593, 607 (B.A.P. 8th Cir. 2003)).

Even assuming that a recovery here by the Trustee will benefit only Mission Bank, the Court declines to limit *Stalnaker* as Danzig suggests. The language in *Stalnaker* is broad and clear, and the Court does not believe a departure from that language is necessary or appropriate.

Therefore, the Court concludes that recovery of the transfer will benefit the estate for purposes of §§ 547 and 550.

**4.     Danzig has a $2 million – not $6 million – "new value" defense.**

Danzig contends that under 11 U.S.C. § 547(c)(4) he is entitled to a $6 million "new value" credit against any preference liability that might be adjudicated against him – a $2 million credit for a capital infusion in that amount he contributed to the Debtor in December 2005, and a $4 million credit because his $2 million contribution was a condition precedent to a post-Transfer, pre-petition extension of a $4 million letter of credit by Mission Bank. The Trustee concedes that Danzig is entitled to the $2 million credit for his capital contribution, but she disputes that he is entitled to the $4 million credit for the simple reason that the Debtor was never able to draw on the $4 million line of credit.

This ostensible dispute does not create a material issue of fact. The Trustee's contention that the letter of credit was never funded is supported by the affidavit of Ronald Bradbury, the Senior vice-president and Chief Lending Officer of Mission Bank. Danzig, on the other hand, has offered absolutely no testimonial evidence or citation to the record in this case to support his contention that the Debtor ever actually received $4 million in new value.[23] Nor has Danzig petitioned the Court to modify or suspend the stay of discovery to refute the Trustee's claim that no advance was ever made. In the absence any such proof, the Court concludes that there is no material issue of fact with regard to the alleged $4 million line of credit provided to the Debtor. The loan was never made because the Debtor could not meet some of the loan conditions and, therefore, Danzig is entitled to a new value credit under § 547(c)(4) of only $2 million.

**5.     The value of Danzig's "benefit" from the Transfer presents a material issue of fact.**

---

[23] Danzig offered a letter from Mission Bank stating that it would loan the Debtor an additional $4 million upon Danzig's injection of $2 million, but that letter says nothing about whether that $4 million loan was ever made.

Section 550 provides that, to the extent a transfer is avoided under (*inter alia*) § 547, "the trustee may recover, for the benefit of the estate, the property transferred or . . . the value of such property" from the transferee. Danzig contends that there is a material issue of fact as to the value of the Transfer. Specifically, Danzig contends that the value of the transfer should be measured by the degree to which the Bank improved its position vis-a-vis the estate as a result of the transfer, and that its improvement in position equals the amount of Mission Bank's claim, minus the amount the Bank would receive in a hypothetical liquidation as of the date of the Transfer.[24] In contrast, the Trustee argues there is no material issue of fact on this point because Danzig concedes that the value of the Debtor's assets on the date of the Transfer ($20 million) exceeded the amount of the Bank's claim ($7,893,150) which was secured by the Transfer. Accordingly, the Trustee argues, the value of the Transfer is simply the amount of the Bank's claim, since the Bank became fully secured as a result of the Transfer.

The Court agrees with Danzig that the issue of value cannot be determined on summary judgment but declines to adopt his methodology. From a general standpoint, Danzig is correct that the value of the Transfer should be measured by the degree to which Mission Bank's position improved as a result of the Transfer,[25] but the Court does not measure this through a hypothetical liquidation. Nor does the Court presume, as the Trustee's calculation suggests, that Mission Bank was wholly unsecured at the time of the Transfer. To the contrary, the parties appear to be in agreement that Mission Bank was partially secured at the time of the Transfer. There is no agreement, however, as to the value of Mission Bank's collateral prior to the Transfer. And that is the key to determining the benefit the Transfer conferred on Danzig. The benefit Danzig received

---

[24] In concrete figures, Danzig contends that if the Transfer had not occurred and Mission Bank was treated as an unsecured creditor, as of the date of the Transfer Mission Bank stood to recover 65-70% of its claim. Therefore, Danzig argues, the Transfer only improved Mission Bank's position, and thus conferred a benefit on him as a guarantor, by approximately 30% of Mission Bank's claim, which is approximately $2.4 million.

[25] *See In re Prindle*, 270 B.R. 743, 747 (Bankr. W.D. Mo. 2001) (discussing substitution of collateral cases and concluding that the value of a preference is the difference between the value of the new collateral and the old collateral (limited, of course, by the amount of the debt)). *See also, Lancaster v. First National Bank of Greeneville (In re Cloyd)*, 23 B.R. 51, 54 (Bankr. E.D. Tenn. 1982). Technically, this case is not a substitution of collateral case, but the methodology for calculating the value of the preferential transfer is the same.

from the Transfer is equal to the amount of Mission Bank's claim as of the date of the Transfer minus the value of Mission Bank's collateral immediately before the Transfer.[26]

Therefore, the value of Mission Bank's collateral prior to the Transfer, which determines the value of the benefit conferred on Danzig as a result of the Transfer, is a material issue of fact which precludes summary judgment. At trial, the parties should be prepared to adduce evidence concerning the value of the collateral prior to the Transfer, that being the only remaining issue where there is a genuine issue of material fact.

## CONCLUSION

For the reasons stated above, the Court finds that the undisputed facts establish all of the elements necessary for the Trustee to prevail on her Complaint under 11 U.S.C. §§ 547(b) and 550(a) to avoid and recover the Transfer from the Defendant, Harold M. Danzig. The undisputed facts also establish that Danzig is entitled to a $2 million credit pursuant to 11 U.S.C. § 547(c)(1) against any amount the Court ultimately finds Danzig is liable to the Trustee for the Transfer. The value of the Transfer, however, presents a material issue of fact which will need to be determined at trial.

A separate order consistent with this Memorandum Opinion will be entered will be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 23rd day of December 2008.

        /s/   Jerry W. Venters
United States Bankruptcy Judge

A copy of the foregoing mailed electronically or
conventionally to:
David. D Ferguson
Benjamin F. Mann

---

[26] By way of example, if the Debtor had $10 million in assets, owed Mission Bank $5 million, and had already pledged $1 million in assets to secure its debt to the bank, a subsequent pledge of $5 million wouldn't improve the bank's position by $5 million; it would improve it by only $4 million.